[1] This is a suit by a real estate broker, Eleanor V. Blase, against defendant, Marian K. Palmer, for a commission alleged to have been earned by plaintiff in procuring a purchaser for defendant's property, located in St. Louis County, and for the expenses incident thereto. The trial below was before the Court — a jury having been waived — and resulted in a finding and judgment for defendant. Plaintiff appealed.
[2] The property in question consisted of a tract of land and dwelling thereon, located at 810 South Warson Road, in which dwelling defendant and her family resided. In August, 1946, defendant decided to dispose of the property and, with that end in view, on August 19, 1946, called the plaintiff's *Page 594 
office on the telephone to arrange for the listing of the property for sale. She talked to one of the employees and, the next day, August 20, 1946, Mrs. Leona Favreau, a saleswoman employed by plaintiff, called personally upon Mrs. Palmer. Mrs. Favreau was shown the premises and made certain notations with reference thereto on the back of a listing contract which defendant thereafter signed. By this contract, plaintiff was appointed the sole and exclusive agent to sell the property.
[3] The contract provided for a fee of five per cent. of the selling price in the event a sale was made. On the reverse side of the contract appears the following stipulation: "Owner does not have to accept contract or pay a commission until they find a suitable place to live." Also on the reverse side of the contract appears the notation: "1 1/5 Acres". There is a dispute in the testimony as to what transpired at the time this last mentioned notation was made.
[4] Mrs. Favreau testified as follows:
[5] "Q. Was there any discussion about the dimensions of the property? The size of the ground? A. As I was taking it down on the listing card I was told what it was; what the ground was and I put it down as I was told.
[6] "Q. Who told you this, Mrs. Palmer? A. Mrs. Palmer.
* * * * * *
[7] "Q. Don't you recall that Mrs. Palmer told you that she wasn't certain about the size of the premises? A. No. She told me it was an acre and one-fifth, and exactly what I put on the card was an acre and one-fifth.
[8] "Q. When did you put that on the card? A. At the time. * * * Right that day. * * * Right there when she signed the listing and I made a description of what she told me.
* * * * * *
[9] "Q. Do you recall, Mrs. Favreau, that Mrs. Palmer said that her husband was away and had the papers so that they were not available and she wasn't certain as to how much ground there was? A. Only pertaining to the loan is all she told me.
* * * * * *
[10] "Q. Do you remember Mrs. Palmer telling you that she wasn't certain as to how much property there was there but that she thought — A. No. That wasn't said at all.
[11] "Q. Do you remember her telling you when they purchased the property through Mr. Love's office that they represented there was an acre and one-fifth there? A. No, sir.
[12] "Q. Was there ever any discussion at any time that you know of about the frontage and the depth of the land? A. That was never brought up even though when Mrs. Palmer walked around with interested clients and we talked about the ground. We walked over it and when I would say an acre and one-fifth there never was a contradiction. I was lead to believe there was an acre and one-fifth, and carried it through."
[13] Mrs. Palmer testified as follows:
[14] "Q. Did she ask you the question with reference to the size or description of the land? A. That is right.
[15] "Q. What did she say? A. She said, `How much land do you have here?' and I said I didn't know.
[16] "Q. And then what more was said, if anything? A. Well, then I said orally when we purchased the property it always had been referred to as an acre and two-tenths, and that Mr. Palmer had always taken care of the details, so far as the written details of the property, but Miss McDermott had always said it was an acre and two-tenths, but I said, `It seems rather silly to refer to it as an acre and two-tenths,' and she said, `I will refer to it then as an acre and a fifth.'
* * * * * *
[17] "Q. Well, was there anything more said by Mrs. Favreau with reference to any procedure that might be taken to obtain the information as to the * * * A. Yes, sir, she said: `You don't have to worry, Miss Blase always looks up everything before she puts anything on paper.'
[18] "Q. Then did you sign your name to these contracts at that time? A. Not at *Page 595 
that time, no, because I was still debating as to whether I wanted to sign any contract.
[19] "Q. When did you then sign this contract? A. After she told me that Miss Blase had been employed by Bakewell, and that she was entirely competent to handle any contract, and that information would be available to her, either at the City Hall or at the Title Company, at any time."
[20] Defendant further testified that Miss McDermott, to whom defendant referred in her testimony, was the person from whom she purchased the property, and that Miss McDermott referred to the property as containing one and two-tenths acres.
[21] Peter Palmer, defendant's son, was present when Mrs. Favreau called on his mother to secure the listing contract. He testified as follows:
[22] "Q. Was anything said by Mrs. Favreau and your mother that you heard with reference to the size of the land, of the property involved? A. Well, I remember them saying something about the driveway and that my mother said that it was an acre and two-tenths, as she had heard it from Miss McDermott, and she didn't know why it was an acre and a fifth, and Mrs. Favreau said she didn't know either, and she would just put it down as an acre and one-fifth.
[23] "Q. Did Mrs. Favreau say anything else about getting the information, or that she had the means of getting information? A. Well, she said she could get the information, that the card didn't mean a thing, that she could get the information from the title company."
[24] Thereafter, through the efforts of Mrs. Favreau, Mr. William T. Mellow became interested in the property and finally signed a contract to buy the same for $30,000 and, at the same time, made an earnest money deposit of $1,500. The "Earnest Money Receipt and Sale Contract" was dated January 3, 1947. It described the property as "a tract of land containing 1.20 acre, more or less, on South Warson Road, and together with all improvements thereon known as and numbered 810 South Warson Road, in St. Louis County, Missouri." The contract also provided that the sale should be closed on February 15, 1947, or on such date as might be agreed to by the parties.
[25] Plaintiff testified that she prepared this contract; that she secured the information to prepare it from the listing card; and that she made no investigation to determine the size of the property at the time.
[26] Mrs. Favreau testified that after she secured the listing of the property no one from their office made any effort to find out how much ground Mrs. Palmer really had.
[27] Mrs. Palmer testified that Mrs. Favreau brought the contract to her for her signature and that she read it and asked Mrs. Favreau if it was all right. Defendant stated that Mrs. Favreau replied that it was definitely all right and that: "We never let anything go out of our office unless Miss Blase looks it over first." Defendant further stated that, relying on this statement, she signed the contract. She further testified that she did not know who gave Mrs. Favreau or Miss Blase the information that the tract contained one and twenty-one hundreths acres, more or less; and that she did not know the area of the lot at said time. She further stated that she asked Mrs. Favreau on one occasion if she would like to have their papers, and that the latter replied that she did not, stating that they could get the information from the title company, or from the Court House.
[28] Thereafter, the title to the property was brought down to date and the other papers necessary for closing the deal were prepared. Plaintiff, Eleanor Blase, prepared these papers. They consisted of a warranty deed, assignments of four insurance policies, and a statement of the transaction. Defendant and her husband had at that time a contract to purchase a house in University City — the deal to be consummated if the sale to Mellow went through.
[29] The papers were then signed and deposited in escrow with the Title Insurance Company. The certificate of title showed that the property contained .83 of an acre, instead of 1.2 as shown in the listing *Page 596 
contract and also in the sale contract. Plaintiff first learned of this when she received the certificate of title from the insurance company, but did not say anything to Mellow about it. She testified:
[30] "* * * and I said nothing to Mellow about it, because I figured that Mellow had his contract there and I sent a copy of the certificate of title, and I sent him a copy of the warranty deed, and if he wanted to figure it out, that was up to him; I was representing the Palmers.
[31] "Q. You were representing the Palmers? A. Yes, sir, and, therefore, I said nothing to Mellow about the acreage being less, although when I drew the deed and when I got the Title Company's report, then I drew the deed and found it less, and then I drew all the instruments and we put the deed in the Title Company, and then when the time of closing came, Mr. Mellow said to me, `it is less acreage, I am not going to go through with it.'"
[32] Plaintiff's conversation with Mr. Mellow was a few days before the closing date, and took place over the telephone. She further testified that in this conversation Mellow said he was going to see the Palmers about the acreage. The impression one gets from plaintiff's testimony is that Mellow indicated he would make an offer for a reduction in price of $1,000 on account of the insufficiency of the acreage.
[33] In rebuttal, plaintiff testified that when she discovered that the acreage was less than stated in the listing contract she did nothing about it. She said: "* * * I did nothing about it because of the fact that I was representing the Palmers — I was not representing Mellow — I was representing Palmer, and I said nothing about it to Mellow to disturb him, nor nothing about it to the Palmers, for the reason that if Mellow did go through after he got the papers, and I sent him copies of the papers of the Title Company, after he got the papers, if he, in turn, didn't object, I certainly wasn't going to object for my clients. * * * I was representing the Palmers, and, naturally, I wasn't going to bring it up to Mellow, who had everything he needed. He had a copy of the certificate of title, and he had a copy of the deed and everything. I found it out, and I didn't feel it my duty to worry somebody I wasn't being paid by."
[34] Thereafter, Mr. Mellow sent to plaintiff the following letter, addressed to Mr. Mrs. Palmer:
"February 17, 1947.
"Marian K. Palmer Allen D. Palmer "810 South Warson Road "Ladue, Missouri "Dear Mr. and Mrs. Palmer:
"Due to a misunderstanding on your property at 810 South Warson Road, on account of the difference in the size of the property as shown in the sales contract and that shown in the title, it will be necessary to cancel this contract.
"Please sign one copy of this letter showing the acceptance of cancellation of the original sales contract dated January 3, 1947, and authorizing Eleanor V. Blase, Realtor, to return the earnest money amounting to $1500.00 to me.
 "Yours very truly, "Wm. T. Mellow."
[35] This letter was forwarded by plaintiff to the Palmers, together with the following letter:
"February 17, 1947.
"Mr. and Mrs. Allen D. Palmer, "810 South Warson Road, "City of Ladue, St. Louis County, "Missouri. "Dear Mr. and Mrs. Palmer:
"Herewith enclosed, in triplicate, is the letter which I read, to you Mr. Palmer, over telephone, which letter is signed by Wm. T. Mellow. Mr. Mellow brought this letter into our office this afternoon.
"After considering the enclosed, let me know your pleasure, please. Thank you.
"As advised you over the telephone, in accord with the terms of the sales contract, we have earned the commission on this sale of No. 810 South Warson Road; and also in accord with the terms of the contract, we are to be reimbursed for the amount we paid the Title Insurance Corporation for its continuation certificate report; and the Escrow charge, which Escrow charge is still due the Title Company. As you *Page 597 
know, the commission is $1500.00; the Continuation Certificate of title is $38.00; and the Escrow charge will be $10.00.
 "Sincerely yours, "Eleanor Blase."
[36] On February 28, 1947, defendant sent the following letter to Mr. Mellow:
"February 28, 1947.
"Mr. William T. Mellow "St. Louis, Missouri "Dear Mr. Mellow:
"I acknowledge receipt of your letter of February 17 tendering rescission and cancellation of the contract of sale which we entered into dated January 3, 1947, concerning the property at 810 S. Warson Road, St. Louis County, Missouri. Inasmuch as I have not been able to find any other satisfactory place to live, I have decided to accede to your request for rescission and cancellation of this contract, and this letter will serve to authorize Eleanor V. Blase, Realtor, to return the earnest money paid by you to her in connection with this matter.
 "Very truly yours, "Marian K. Palmer."
[37] Thereafter, Miss Blase returned the $1,500 earnest money deposit to Mr. Mellow. She then filed this suit.
[38] Appellant assigns as error the action of the trial court in overruling her objection to any and all testimony concerning conversations or dealings had between the appellant and respondent prior to the signing of the earnest money contract of January 3, 1947. The objection, as developed in appellant's brief, is specifically made to the cross-examination of plaintiff relative to her knowledge concerning the acreage actually owned by defendant, and to testimony of conversations between Mrs. Favreau and Mrs. Palmer at the time the listing contract was entered into with reference to the size of the tract of land in question. The basis of the objection is that the evidence was rendered inadmissible by the parol evidence rule.
[39] There is no merit to the objection. Defendant did not seek to vary the terms of the earnest money contract by this evidence. Its purpose was to show that the incorrect description of the property contained in said contract, which rendered it unenforceable, was not due to any fault of the defendant, but was wholly attributable to the neglect of plaintiff to secure a proper description from the title company. The parol evidence rule has no application whatever, and the court did not err in admitting and considering this evidence.
[40] Appellant's principal contention is that the court erred in finding for respondent, for the reason that appellant earned her commission and was entitled to the same as soon as the earnest money contract was signed by respondent and William Mellow. To this we cannot agree.
[41] Plaintiff was employed to sell defendant's premises at 810 South Warson Road upon terms acceptable to defendant. Plaintiff produced a customer ready, willing and able to purchase the premises — if it contained 1.2 acres — at the price that defendant finally agreed to take; but said customer was not willing to pay said price for 810 South Warson Road if it contained only .83 of an acre. Defendant's premises contained only .83 of an acre. Therefore, plaintiff failed to produce a customer ready and willing to purchase the defendant's property on terms acceptable to the defendant.
[42] But, appellant contends that, because defendant stated that her property contained 1.2 acres, defendant became liable to her for the commission when she produced a customer ready, willing and able to purchase if the property had contained 1.2 acres. However, according to defendant's testimony, she made no such positive statement, but said that she did not know what the amount was and that Miss McDermott, the former owner, always said it contained 1.2 acres. Defendant further testified that Mrs. Favreau then said she did not have to worry because "Miss Blase always looks up everything before she puts anything on paper."
[43] Peter Palmer corroborated the testimony of his mother, stating that Mrs. Favreau said the listing card did not mean a thing, *Page 598 
and that she could get the information from the title company.
[44] We believe that defendant and her son were telling the truth, and find from the testimony that there was no warranty or intended misrepresentation made by defendant with respect to the area of the tract of land in question. The evidence in the case shows that plaintiff was employed to find a purchaser for defendant's premises as it stood. This she did not do. Such being the case, plaintiff is not entitled to recover. Gottlieb et al. v. Connolly, 136 A. 599, 5 N.J.Misc. 372; Hausman v. Herdtfelder, 81 App.Div. 46, 80 N.Y.S. 1039.
[45] The judgment is affirmed.
[46] HUGHES and McCULLEN, JJ., concur.